IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARK D. WILLIAMS, | ) | CASE NO. 1:20CV1511 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Mark Williams ("Williams") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

As set forth more fully below, the Administrative Law Judge failed to sufficiently

explain his analysis of the record evidence.  Accordingly, the undersigned recommends that the

Court **REVERSE and REMAND** the Commissioner's decision for further proceedings

consistent with this opinion.

## I. Procedural History

Williams filed applications for DIB and SSI in July 2018, alleging a disability onset date

of March 9, 2015.  Tr. 15, 185, 196.  He alleged disability based on a traumatic brain injury.  Tr.

230.  After denials by the state agency initially (Tr. 92, 93) and on reconsideration (Tr. 120,

121), Williams requested an administrative hearing.  Tr. 134.  A hearing was held before an

Administrative Law Judge ("ALJ") on August 12, 2019.  Tr. 35-65.  In his August 21, 2019, decision (Tr. 15-28), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Williams can perform, i.e., he is not disabled.  Tr. 26-27.  Williams requested review of the ALJ's decision by the Appeals Council (Tr. 182) and, on May 11, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Williams was born in 1959 and was 55 years old on his alleged onset date.  Tr. 26.  He has three years of college.  Tr. 231.  His past work was 25 years as a chief operating officer of a retail party supply business.  Tr. 55-56, 231.

### B. Relevant Medical Evidence

On March 9, 2015, Williams presented to an urgent care facility after a steel pallet rack fell onto his head.  Tr. 293.  He had a moderate headache and a laceration, which was sutured.  Tr. 293-294.

On April 16, 2015, Williams saw Dr. Bailey, M.D., at a family practice for various issues, including that he was still having pain from his head injury the month before.  Tr. 296.  He also reported feeling depressed the last several days.  Tr. 296.  Dr. Bailey asks several questions regarding his depressive symptoms and his interpretation was mild depression.  Tr. 296.  Dr. Bailey's assessment was post-concussion syndrome, head injury, and screened for depression.  Tr. 298.  He ordered a brain MRI and referred Williams to neurology.  Tr. 298.

On April 5, 2018, Williams had an MRI, which showed mild chronic microvascular changes and "generalized atrophy, advanced for age."  Tr. 350-351.

On April 10, 2018, Williams had an initial evaluation for speech therapy with a licensed speech/language pathologist.  Tr. 331-334.  He described his traumatic brain injury (TBI) in 2015 and a prior TBI in 1981 when he was thrown through a windshield.  Tr. 331.  He explained that, three weeks before his injury, he had lost his longstanding job.  Tr. 331.  After an evaluation, he was diagnosed with mild to moderate cognitive communicative defects.  Tr. 333. The therapist stated that Williams presented with mild to moderate cognitive communicative deficits characterized by reduced recall of verbal and visual information suggesting possible information processing deficits, and difficulty with thought formulation and planning and organization deficits.  Tr. 333.  He was to begin therapy and his prognosis to reach goals was good.  Tr. 334.

At a July 25, 2018 speech therapy session, Williams was "somewhat distracted" due to having had major problems with his car the day before and related financial concerns.  Tr. 310.

On August 21, 2018, Williams completed a Function Report.  Tr. 244-251.  He stated that he had difficulty staying focused on a task and that it was sometimes hard to understand spoken or written information.  Tr. 249.  He did not read books as his attention was only for periods of ten minutes, but he read a lot of news articles.  Tr. 248.

On August 6, 2018, Williams received a letter from Opportunities for Ohioans with Disabilities ("OOD"), stating that he was in the "significantly disabled" priority category, and, therefore, deemed eligible to receive vocational rehabilitation services.  Tr. 409.

On August 3 and October 5, 2018, Williams saw Dr. Fraser, Ph.D., for a neuropsychological evaluation.  Tr. 416.  He reported that he lived alone and had three grown children.  Tr. 418.  After performing a number of psychological tests, Dr. Fraser opined that Williams' verbal and nonverbal intellectual functioning were "consistent with premorbid

expectations." Tr. 420.  She diagnosed Williams with traumatic brain injury, with loss of consciousness for 30 minutes or less, causing a mild neurocognitive disorder and adjustment disorder with mixed anxiety and depression.  Tr. 420-421.

In 2018, Williams participated in vocational services and speech therapy.  E.g., Tr. 430, 484.

On November 23, 2018, Williams saw Dr. Smith, Ph.D., for a psychological evaluation. Tr. 472-476.  Dr. Smith diagnosed Williams with adjustment disorder with mixed anxiety and depressed mood.  Tr. 476.  Williams continued counseling with Dr. Smith (E.g., Tr. 481, 494, 512, 518, 528) and treatment with Dr. Begley, M.D., for his traumatic brain injury (E.g., Tr. 502-505, 524-527).

### C. Opinion Evidence

#### 1. Treating Source

On August 8, 2019, Dr. Smith completed a Mental Impairment Questionnaire on Williams' behalf.  Tr. 538-539.  She had seen him once or twice a month since November 2018 and listed his diagnoses: adjustment disorder with mixed anxiety and depressed mood and mild cognitive disorder due to TBI.  Dr. Smith opined that Williams would have serious limitations in the following work activities: carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday or workweek without interruptions from psychologically based symptoms, remembering locations and work-like procedures, understanding and remembering detailed instructions, and setting realistic goals or making plans independently of others.  He would be absent from work two to three days per month, could not work an 8-hour day, and could not work 5 days per week.

#### 2. Consultative Examiner

On September 24, 2018, Williams saw Dr. Liao, Psy.D., for a consultative examination. Tr. 365-375.  He stated that he had difficulty focusing on a task, he loses his attention span, and his short-term memory is poor.  Tr. 365.  His activities of daily living were "not impacted by psychological or medical symptoms."  Tr. 373.  He was able to dress, bathe, cook, feed himself, shop, and manage money.  Tr. 373.  Upon administration of the Wechsler Adult Intelligence scale, Williams had some mild difficulties with the general fund of information but scored within the average range for his age.  Tr. 369.  Upon administration of the Wechsler Memory Scale testing, Williams had difficulties and tested in the low average range.  Tr. 371.  Dr. Liao opined that Williams had some memory issues but they "do not reach a clinical level."  Tr. 373.  His recent and remote memory skills were intact.  Tr. 373-374.

### 2. State Agency Reviewing Physicians

On September 29, 2018, Dr. Rozenfeld, Psy.D., reviewed Williams record and opined that he would have mild limitations in understanding, remembering, or applying information and concentrating, persisting or maintaining pace and, therefore, Dr. Rozenfeld assessed no RFC limitations.  Tr. 72.  On November 1, 2018, Dr. Waggoner, Psy.D., agreed.  Tr. 99-100.

## D.  Testimonial Evidence

### 1. Williams' Testimony

Williams was represented by counsel and testified at the administrative hearing.  He had just started a new job the day before the hearing doing maintenance at a golf course.  Tr. 40.  The job was part time but he "is hoping it will last beyond the season."  Tr. 40.  Previously he had participated in two vocational programs.  Tr. 40.  The programs helped him to some extent; they helped him become more socially adept when being around people.  Tr. 40.

Williams discussed his recent job working part-time at Goodwill.  Tr. 42.  It was a very

physical job; he accepted donations.  Tr. 42.  When asked if he experienced difficulty performing

that job, Williams stated that it was very physical, he had warehousemen working for him and

they had difficulty staffing the position.  Tr. 44.  He had problems with communication.  Tr. 44.

At that point at the hearing, it appeared that Williams had taken some time to answer that

question and the ALJ took a 5-minute break so that Williams could compose himself.  Tr. 44-45.

After the break, Williams explained that sometimes he completely forgets his thoughts and he

doesn't have an answer for the question.  Tr. 45.  It is embarrassing, and he was feeling a little

nervous at the hearing.  Tr. 46.

     Williams advised that he had no physical problems that kept him from working; it was all

mental problems.  His primary problems were staying focused on a given task and memory

challenges.  Tr. 46.  He loses track of things.  Tr. 46.  It wasn't always a problem for him at his

job at Goodwill because it wasn't repetitive; there was always something to do and he could

move from one thing to another thing.  Tr. 47.  However, he did experience workplace stress

there.  Tr. 47.  He explained that there was a person there that did not care for him.  Tr. 47.

When asked again about workplace stress, Williams stated that it was physical, and that he

worked independently.  Tr. 47.  Sometimes when they would be busy with a lot of donations it

would be stressful, but that was more physical stress.  Tr. 48.  He also stated that he is a morning

person and his brain works better then.  Tr. 48, 50.  As the day wears on, at about 2 or 3 o'clock,

he doesn't process information as quickly and becomes mentally fatigued.  Tr. 48-49.  It

becomes difficult for him to focus and concentrate.  Tr. 49.  That happened most days.  Tr. 49.

At that point he is usually at home, and he takes a walk in the park behind his house.  Tr. 49.  He

also has problems sleeping.  Tr. 50.

     When asked how he gets along with people, Williams stated that, since he stopped

working his prior job operating business, he interacted with a lot of people, but, since the

accident in 2015, which happened shortly after he lost his business job, he has mostly only had

interactions with his adult children.  Tr. 51.  He has brothers and sisters and speaks to them every

once in a while.  Tr. 51.

When asked if he has problems organizing things, he stated that he does.  Tr. 51.  His

speech therapist had been very effective in helping him organize things, such as paying bills.  Tr.

51.  He still uses the tools she developed to help him.  Tr. 51.  She also helped him communicate

better.  Tr. 52.  He had not been very good at communicating in a direct manner and would

overstate things and become overly verbose.  Tr. 52.  When asked if he has difficulty organizing

things in his home now, Williams stated that he does.  Tr. 52.  He is unorganized and loses things

and forgets things.  Tr. 52.  But he has a process that he follows, such as putting his keys in the

same place, and most of the time they are there.  Tr. 52.  He used to lose his wallet all the time,

but that doesn't happen anymore.  When he walks in his door, he sets his things down on the

counter most of the time.  Tr. 52.  Once in a while he may fall into old habits and misplace

things, but, for the most part, things at home are more organized.  Tr. 52.

When asked if he has difficulty driving and navigating directions, Williams answered that

he is better reading directions than hearing them, so he reads the directions (for example when he

drove to the hearing) and writes them down.  Tr. 53.  He had some trouble finding the hearing

location that morning, although he was somewhat familiar with the area, and he had to find

parking.  Tr. 53.  He takes notes on where his car is parked (it was in M, across from L, by the

train), but, nevertheless, it may take him awhile to find his car.  Tr. 53.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  The ALJ discussed with the VE

Williams' past work.  Tr. 55-56.  The ALJ asked the VE to determine whether a hypothetical individual of Williams's age, education, and work experience could perform his past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below.  The VE answered that such an individual could not perform Williams' past work but could perform six jobs that exist in significant numbers in the national economy, including the following, medium level jobs: kitchen helper and hospital cleaner.  Tr. 56-59.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his August 21, 2019, decision, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.  Tr. 18.

2.     The claimant has not engaged in substantial gainful activity since March 9, 2015, the alleged onset date.  Tr. 18.

3.     The claimant has the following severe impairments: status posttraumatic brain injury with concussion syndrome, adjustment disorder with mixed anxiety and depressed mood, and mild neurocognitive disorder.  Tr. 18.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 18.

5.      The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: he can never climb ladders, ropes, or scaffolds; can, up to frequently, climb ramps and stairs; can, up to frequently, balance, stoop, kneel, crouch and crawl; he must avoid concentrated exposure to vibration; he must avoid all exposure to hazards (heights, machinery, commercial driving); and mentally, he can perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions (no arbitration, negotiation, or confrontation). Tr. 20.

6.      The claimant is unable to perform any past relevant work. Tr. 26.

7.      The claimant was born in 1959 and was 55 years old, which is defined as an individual of advanced age, on the alleged disability onset date. Tr. 26.

8.      The claimant has at least a high school education and is able to communicate in English. Tr. 26.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills. Tr. 26.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 26.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from March 9, 2015, through the date of this decision. Tr. 28.

## V. Plaintiff's Arguments

Williams argues that the ALJ failed to properly evaluate the evidence. Doc. 14, p. 1.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Williams argues that the ALJ misstated the evidence when he characterized the results of Williams' head MRI.  Doc. 14, p. 10; Doc. 19, p. 1.  He asserts that the ALJ failed to recognize that the MRI showing mild chronic microvascular changes and generalized atrophy was "advanced for his age."  Id. (citing Tr. 350-351).  The undersigned agrees that, in light of additional problematic portions of the ALJ's decision, detailed below, the ALJ's failure to note that the MRI results were atypical for someone Williams' age is error.

More troubling is the following exchange at the hearing:

Q (Attorney): So with that being said, did you experience any difficulty performing your occupation as a donation attendant [at Goodwill] on a part-time basis?

A (Williams): Well, it was -- like I say, it was very physically, and I really mean that. I had warehouseman work for me. So – but because they had such difficulties in staffing that position -- and the other difficulties were -- I can't remember. I can't remember. I forgot.

Q: Take your time.

A: I'm sorry.
Sorry.
Just communication.

Q: Can you tell me what you're experiencing right now?

A: (No verbal response.)

ALJ: Off record. I'll give him 5 minutes to compose himself.

Williams: Okay. I'm sorry.

ALJ: Off record.

Williams: I'm sorry.

ALJ: And if you aren't able to testify, we're going to the VE.

Williams: No. I'm okay. I'm okay.

ALJ: I'm just – I'm not going to have -- I'm not going to have long blank tapes.

Williams: I'm sorry. No. I'm sorry but –

ALJ: I'll give you 5 minutes to compose -- 5 minutes.

Williams: Yeah. I'm fine.

(Off the record at 9:43 a.m.)<br>
(On the record at 9:51 a.m.)

ALJ: Okay. We're back on the record to give the claimant an opportunity to compose himself. Okay?

Williams: Okay. Yeah.

ALJ: All right. Please proceed, Counsel.

BY THE ATTORNEY:
Q: Now, you had some trouble answering questions sometimes.

A: Yeah.

Q: Did you want to something to the Court? [sic]

A: Well, no. I was just -- it just -- sometimes I can't – I'm forgetting what I'm -- my thought completely. You've asked me a question, and I just -- there isn't an answer there. I mean, it just -- so I apologize.

Q: So -- you don't have to apologize because this is not -- you know, this is not –

A No. It's embarrassing.

Q: It's a symptom of what you're dealing with. Correct?

12

A: Mm-hmm. It's embarrassing.

Q: Okay. Well, you don't have to feel embarrassed.

A: Okay. Okay.

Q: Do you feel nervousness?

A: Nerve -- yes. I'm a little nervous, yeah.

ALJ: Which is normal.

Williams: Yeah.

ALJ: This is an important thing.

Williams: Normal to be nervous, yeah.

Tr. 44-45.  This terse exchange wherein the ALJ appeared to be annoyed because Williams could not find the words to answer the question posed to him and threatened to stop him from testifying at all because he did not want blank spaces on the hearing tape is problematic. Williams has a cognitive impairment that is documented by reduced recall of verbal information, difficulty with thought formulation, and attention and memory deficits.  It is also documented that anxiety makes Williams' impairments worse.  Tr. 420.  The ALJ's response to Williams' inability to answer a question at the hearing gives one pause as to whether the ALJ appreciated the symptoms caused by his impairments.

Williams also challenges the ALJ's finding that Dr. Smith's opinions were not persuasive.  Doc. 14, p. 14.  The undersigned agrees that the ALJ's assessment of Dr. Smith's opinion is problematic.  The ALJ had explained that Dr. Smith's checkbox form "did not provide any rationale for h[er] selections."  Tr. 528.  But Dr. Smith had indicated in the checkbox form that her selections were based on the attached neuropsychological assessment, i.e., she arguably provided rationale for her selections.  Tr. 528.  The ALJ's only other rationale for discounting

13

Dr. Smith's opinions was that her finding that Williams could not work an 8-hour shift "is an issue reserved for the Commissioner and it is neither inherently valuable nor persuasive."  Tr. 25 (citing 20 CFR 404.1420b and 416.920b).[2]  And yet, despite stating that Dr. Smith's opinion that Williams is limited to working a 4-6 hour shift, rather than an 8-hour shift, is an issue reserved for the Commissioner, the ALJ also, later in his decision, discounted Williams allegations regarding his symptoms because, in part, "No treating source … has otherwise described the claimant as 'totally and permanently disabled' by his impairments and complaints."  Tr. 25.

Although there may be evidence in the record that could support the mental limitations assessed by the ALJ in his RFC assessment, it is the duty of the ALJ, not this Court, to cite that evidence and explain how it supports the conclusions drawn from it.  Simply put, the ALJ did not sufficiently explain that evidence and tie it to his RFC finding.  Accordingly, the undersigned recommends that the decision of the Commissioner be reversed and remanded.

---

[2] It would appear that the ALJ intended to cite 20 CFR § 1520b, not § 1420b.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for proceedings consistent with this opinion.[3]

Dated: June 25, 2021

/s/Kathleen B. Burke
_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

_____
[3] This opinion should not be construed as a recommendation that, on remand, Williams be found disabled.